UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HART,<br><br>            Plaintiff,<br><br>       v.<br><br>EDGARDO SANDOVAL, an individual, and COUNTY OF TULARE, a public entity,<br><br>            Defendants. | Case No.   1:24-cv-00071-HBK<br><br>ORDER DENYING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE<br><br>(Doc. No. 24-6)<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]<br><br>(Doc. No. 24) |

   Defendants Edgardo Sandoval ("Sandoval") and the County of Tulare ("County") filed a Motion for Summary Judgment on June 23, 2025. (Doc. No. 24, "Motion"). Defendants seek summary judgment against Plaintiff Robert Hart ("Plaintiff") on all claims. (*Id.*). Plaintiff filed an Opposition (Doc. No. 25), and Defendants filed a Reply (Doc. No. 32). The Court finds the matter suitable for decision without oral arguments. (Doc. No. 37). Finding no material facts in dispute, the Court grants Defendants' Motion for Summary Judgment.

////

---

[1] Both parties have consented to the jurisdiction of a magistrate judge in accordance with 28 U.S.C. §636(c)(1). (Doc. No. 12).

1

I. **BACKGROUND**

**A. Procedural History**

On January 17, 2024, Plaintiff initiated this action by filing a civil rights complaint against Defendants Edgardo Sandoval and County of Tulare. (Doc. No. 1, "Complaint"). Therein, Plaintiff alleges Defendants arrested him for domestic violence without an arrest warrant and without probable cause on January 18, 2022. (*Id.* at 3-5). The Complaint vaguely alleges that "the violations of Plaintiff's constitutional rights complained of herein were caused by the customs, policies, and/or practices of authorized policymakers of [the County's sheriff's department], which encouraged, authorized, directed, condoned, and/or ratified the unconstitutional and unlawful conduct complained of herein." (*Id.* at 3). The Complaint contains two causes of action pursuant to 42 U.S.C. § 1983: (1) False Arrest and Imprisonment – Fourth and Fourteenth Amendments; and (2) Equal Protection Clause. (*Id.* at 5-6). On May 6, 2024, Defendants filed their Answer. (Doc. No. 8). On June 23, 2025, following discovery in this matter, Defendants filed the instant Motion for Summary Judgment on all Plaintiff's claims. (Doc. No. 24). Plaintiff filed an Opposition on July 7, 2025.[2] (Doc. No. 25). Defendants filed their Reply on July 16, 2025. (Doc. No. 32).

**B. Arguments and Record Before the Court**

In support of their Motion, Defendants submit: a Memorandum of Points and Authorities (Doc. No. 24-1); a Statement of Undisputed Material Facts (Doc. No. 24-2); Defendant Sandoval's Declaration, with various exhibits, including multiple incident and crime reports from Defendants' encounters with Plaintiff and his wife, a copy of an emergency protective order ("EPO") against Plaintiff, photos of Plaintiff's wife, Elizabeth "Lily" Hart, and Plaintiff's discovery responses (*see* Doc. No. 24-3, Exhibits A-O); and various body camera footage from responding officers (*see* Doc. No. 24-4, Exhibits B-K); and Defendants Request for Judicial Notice (Doc. No. 24-6). Defendants argue that because Sandoval had probable cause to believe

---

[2] Plaintiff's opposition was initially filed as a combined opposition and cross motion for partial summary judgment. (*See* Doc. No. 25 at 6; Doc. No. 29). Plaintiff subsequently filed a notice of withdrawal of his cross-motion based on Defendants' objection to the filing of a cross motion after the deadline set by the Scheduling Order. (Doc. No. 31).

Plaintiff committed acts of domestic violence against his wife, Plaintiff's false arrest claim necessarily fails. (Doc. 24-1 at 11). Defendants point to reports from both Plaintiff's wife, Lily, and her friend Vicki that Plaintiff had harmed Lily a few weeks earlier and again the morning of Plaintiff's arrest; reports that Lily and Vicki had pictures of Lily's past injuries; Sandoval's confirmation that there were unsecured firearms in the home; and the issuance of the EPO against Plaintiff for Lily as supporting probable cause for Plaintiff's arrest. (*Id.* at 13-14). Alternatively, Defendants argue Sandoval is entitled to qualified immunity. (*Id.* at 14-15 (citing *Rodis v. City and Cnty. of San Francisco*, 558 F.3d 964, 970-71 (9th Cir. 2009))).

As to Plaintiff's Equal Protection claim, Defendants argue Plaintiff's Complaint fails to provide any factual allegations describing how his rights were violated, and to the extent Plaintiff's discovery responses indicate his claim is based on allegedly different treatment between himself and Lily, such a claim fails because Plaintiff's January 18, 2022 arrest and an earlier arrest on July 21, 2021 were both supported by probable cause. (*Id.* at 17-19). Defendants argue a false arrest claim against the County is improper because "a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents" and because there is a lack of a constitutional violation or evidence that such was the result of a policy, custom, or practice of the County, Plaintiff cannot establish liability pursuant to *Monell v. Department of Social Services*, 456 U.S. 658, 694 (1978). (*Id.* at 10-11, 20-22).

Plaintiff's Opposition includes a Memorandum of Points and Authorities (Doc. No. 25) and is supported by a Statement of Undisputed Facts and Additional Material Facts (Doc. No. 26); Sandoval's deposition transcript and Plaintiff's declaration (*see* Doc. No. 27); and body camera footage from two additional officers (*see* Doc. No. 30). In arguing that probable cause for his arrest did not exist, Plaintiff attacks Lily's credibility and asserts that no reasonable officer would have found her reports to be "reasonably trustworthy." (Doc. No. 25 at 18). Plaintiff argues that "officers failed to take independent action to attempt to corroborate the statements before they arrested Robert" such that the arrest was not supported by probable cause. (*Id.* at 18-19). Additionally, Plaintiff argues that because the arrest occurred in the curtilage of his home, it was presumptively unreasonable. (*Id.* at 19-23). Plaintiff argues Defendants cannot rebut the

presumption of unreasonableness because Lily did not consent to a search of the home and there were no emergency or exigent circumstances to justify his arrest given that Plaintiff was immediately detained as soon as he returned to the property and could not access any contraband in the home. (*Id.* at 24-25). As to the Equal Protection claim, Plaintiff argues Defendants failed to satisfy their initial burden of presenting evidence negating the claim or demonstrating Plaintiff's inability to produce such evidence. (*Id.* at 29).

Defendants' Reply is accompanied by their reply to Plaintiff's opposition to their statement of material facts and Defendant's opposition to Plaintiff's additional material facts. (Doc. No. 32-1). In their Reply, Defendants' argue summary judgment is proper because "the undisputed facts show that at the time Deputy Sandoval arrested Plaintiff, he reasonably believed that Plaintiff had committed a crime of domestic violence when he pushed his wife down during an earlier altercation and [Lily] Hart consented to the [sheriff's department's] presence to investigate Plaintiff's alleged acts of domestic violence." (Doc. No. 32 at 2). Defendants argue that regardless of whether the arrest occurred in the curtilage, they "were invited onto the marital property, including inside the residence, to investigate allegations of domestic violence" and this consent is an exception to the warrant requirement. (*Id.* at 5-6).

## II.     LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Id.* at 323. An issue of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden then shifts to the opposing party to

present specific facts that show there to be a genuine issue of a material fact. *See* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

The court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and showed judgment to be appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). "[A] court ruling on a motion for summary judgment may not engage in credibility determination or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted). The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002). A mere scintilla of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly supported summary judgment motion. *Anderson*, 477 U.S. at 252. And, where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts. *See* Fed. R. Civ. P. 56(e)(2). Where a plaintiff's sworn statement contradicts a defendant's sworn statement, the court is required to "disregard the latter and credit the former." *Spencer v. Pew*, 2024 WL 4297515, at *1 (9th Cir. Sept. 16, 2024). However, "to the extent that

1  the uncontested video evidence from the officer's body cameras establishes the timing and
2  occurrence of events," the court must "view[] the facts in the light depicted by the videotape." *Id.*
3  (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

### III.  REQUEST FOR JUDICIAL NOTICE

Defendants request the Court to take judicial notice of: (1) the Request for Domestic Violence Restraining Order filed by Elizabeth K. Hart on January 21, 2022 in Tulare County Superior Court Case no. VFL290175, attached to the Evidence in Support of the Defendant's Motion as Exhibit N; and (2) the Temporary Restraining Order dated January 24, 2022, in Tulare Cunty Superior Court Case no. VFL290175, attached to the Evidence in Support of the Defendant's Motion as Exhibit O.  (Doc. No. 24-6).  Plaintiff disputes the relevancy of these documents in his Opposition.  (Doc. No. 25 at 16).

Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial jurisdiction," or they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court may take judicial notice on its own or at the request of any party. *Id.* at 201(c). "[C]ourt filings and other matters of public record" are properly judicially noticed.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir.2006); *see also Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388, fn.9 (9th Cir. 1987).  Additionally, courts generally judicially notice other court proceedings "if those proceedings have a direct relation to the matters at issue." *United States ex. Rel. Robinson Rancheria Citizens Counsel v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citations and internal quotation marks omitted); *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011).  However, a court may not take judicial notice of findings of facts from another case. *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006).

While the Court finds both items technically proper for judicial notice, the Court denies Defendants' request because the Court does not consider either relevant at this stage of the proceedings to the issue before the Court.  "Probable cause must be determined at the time the arrest is made[;] facts learned or evidence obtained [after] a stop or arrest cannot be used to

support probable cause unless they were known to the officer at the moment the arrest was made." *Allen v. City of Portland,* 73 F.3d 232, 236 (9th Cir.1996) (citing *Wong Sun v. United States,* 371 U.S. 471, 482, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).  Thus, the Court will deny Defendants' Request.

## IV.  UNDISPUTED FACTS

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties.  The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate for purposes of considering this Motion for Summary Judgment.   The following facts set forth below are based either on facts the parties do not dispute or an independent review of the body camera footage of Defendants' interactions with Plaintiff and Lily.

### A. Plaintiff's First Arrest

On July 21, 2021, in response to a 911 call from Lily, County sheriff deputies reported to Plaintiff's residence and encountered Plaintiff and Ornella Lis Mazza ("Lis") but were unable to locate Lily.  (Doc. 26 at 2, ¶¶ 1, 2).  Lis indicated Lily had hit her but she did not want to press charges, and deputies asked Lis if she was willing to sign a non-prosecution agreement.  (*Id.* at 3, ¶¶ 4).  The body camera footage shows that after completing paperwork, an officer said, "Okay, Lis" and Plaintiff immediately stated, "Watch what you're signing, Lis." (Def. Ex. B at 29:01). The officer explained the form and Plaintiff again interjected, "You don't have to sign anything." (*Id.*).  The officer informed Plaintiff he was not helping and not to interfere, and Lis told Plaintiff that she did not want to press charges, but she did not know what to do.  (*Id.* at 29:45).  Plaintiff told Lis, "I wouldn't sign it because you don't know what it is, you don't know what the implications is, you don't know what can happen."  (*Id.* at 30:07).  Plaintiff also made comments that no hitting had occurred.  (*Id.*).  The officers proceeded to arrest Plaintiff for interfering with an investigation during the July 21, 2021 encounter.  (*Id.*).

## B. January 18, 2022 Encounters

In the early morning of January 18, 2022, Deputy Adam Mueller responded to the home of Lily's friend and met with Lily, who explained she had an audio recording of Plaintiff and Lis where she believed they were talking about killing her. (Doc. 26 at 3-4, ¶¶ 7,8). Later that same morning, Defendant Deputy Sandoval and two other deputies were dispatched to Plaintiff's home in response to a 911 call from Lily asserting that Plaintiff was armed and would not let her leave the property. (*Id.* at 4, ¶¶ 9, 10). The deputies were wearing body cameras that show their interactions with Plaintiff and Lily.

Sandoval's[3] body camera began recording while he was driving to Plaintiff's property with his sirens activated. (Def. Ex. G). Upon arrival at the property, Sandoval parked his cruiser at the end of a long driveway outside of a gate and immediately encountered Plaintiff, who asked what was going on. (*Id.* at 6:45). Sandoval asked Plaintiff if there was an altercation with his wife and Plaintiff responded, "she's coming unglued." (*Id.* at 7:30). Plaintiff reported that Lily stole his phone, was a narcissist, and thought Plaintiff and Lis were having an affair. Plaintiff explained that Lily had a recording device in the kitchen the night before while he and Lis were eating dinner. Lily was not on medications and had not been diagnosed with any mental health issues. Plaintiff indicated this was normal behavior for Lily. Plaintiff denied trying to get into Lily's room. Plaintiff indicated he told Lily that if she did not give him her phone back, he would make it so her car would not run. (*Id.* at 10:10). Plaintiff denied being armed. (*Id.* at 11:35).

Sandoval began walking up the driveway while Plaintiff drove up the driveway in a golf cart. (*Id.* at 13:45). Sandoval told Plaintiff that he was informed that the sheriff's department had been out earlier in the morning for something similar. Once Sandoval reached the house, he joined the other deputies on a walkway after they spoke to Lily, and the deputies conversed for approximately six minutes. (*Id.* at 16:32). Sandoval walked over to speak with Plaintiff and had a brief, unrecorded conversation before he returned to the other deputies. (*Id.* at 22:51).

Sandoval then approached Lily on the porch to ask her if she had Plaintiff's cellphone and

---

[3] Because, as Plaintiff argues, it is what Sandoval knew when he made the arrest that is most relevant to the issues, the Court primarily relies on Sandoval's body camera footage.

8

asked her to retrieve it. (*Id.* at 24:08). The deputies briefly discussed the earlier July 2021 visit while waiting for Lily to return. Once Lily returned and surrendered Plaintiff's phone, a female deputy advised Lily of the process to obtain a restraining order. (*Id.* at 25:04). She explained that until Lily obtained that order, the deputies legally could not force Plaintiff to leave the property. Lily indicated she was going to wait for a few friends to accompany her, but reported that the situation with Plaintiff had been escalating to "them being physical" with her. (*Id.* at 26:30).

Sandoval walked away while the female deputy was speaking with Lily. (*Id.* at 27:20). Sandoval returned Plaintiff's phone to him and advised Plaintiff to "leave her alone for at least a day." (*Id.* at 27:44). He told Plaintiff: "Just so you know, if we come out here again for similar stuff, things might go a little different." (*Id.* at 28:22). Plaintiff said he would leave before the deputies, but he could not get out until the officers moved their vehicles. (*Id.* at 29:25). Sandoval then walked back to the house to rejoin the other deputies. (*Id.* at 30:22). Lily came out of the home to inform the deputies of "another important issue" regarding money on the property, and the officers informed her it was a civil matter. (*Id.* at 31:30). Lily expressed her concern that Plaintiff would take all of their money if she left the property. Lily reiterated that she wanted to wait for her friend to come before she left. (*Id.* at 33:40).

Sandoval then walked away from the home and confirmed with Plaintiff that he was leaving. (*Id.* at 33:50). Sandoval again told Plaintiff that if "we have to come out here again, and similar things are said, our hands are tied." (*Id.* at 34:16). Sandoval proceeded to walk down the driveway back to his cruiser. (*Id.* at 34:40). Approximately a minute after the deputies reached their vehicles, Plaintiff exited the property. (Doc. 26 at 6, ¶ 16).

**C. Investigation and Plaintiff's Second Arrest**

Later that same day, at approximately 11:00 a.m., Lily again called emergency dispatch and requested that deputies return to the property. (Doc. No. 6 at 6, ¶ 17). Sandoval was one of the reporting deputies and his body camera captured the events. As he entered the property on the second visit, Sandoval encountered a man in a truck on the driveway, who informed Sandoval that he was a neighbor and came over to check on Lily after seeing the officers at the property that morning. (Def. Ex. K at 1:50). The neighbor told Sandoval, "I thought maybe he really hurt

9

her." After proceeding up the driveway, Sandoval encountered a man and a woman who identified themselves as friends of Lily. (*Id.* at 3:51).

The female friend, Vicki Riddle, informed the deputies that two or three weeks ago, Lily texted her that Plaintiff had just beaten her up. (*Id.* at 5:45). Lily sent Vicki pictures that Vicki provided to a private investigator, but Vicki did not contact law enforcement at that time. Lily informed Vicki about the recording of Plaintiff and Lis, and the male friend surrendered the recording to Sandoval, who placed it in a paper bag in the trunk of his vehicle. (*Id.* at 7:37). Vicki described calling the sheriff's department that morning after Lily had first called her about the recording and expressed concern for her safety. After Vicki saw Lily returning to the property, Sergeant Sarah Olmos told Vicki that Lily needed to say what happened in her own words, referencing an earlier conversation where Lily had called and was asking about the elements of a crime. (*Id.* at 10:55). As Lily exited her vehicle, Vicki approached her and asked, "when did he push you down?" (*Id.* at 12:05). The deputies asked Lily if they could talk privately, after which Vicki informed Lily that she gave the officers the recording. Lily became upset, insisting that she needed to have the recording. Lily proceeded into the house with the officers following her. (*Id.* at 13:30).

Once in the kitchen of the house, Lily told the officers, "This man is going to kill me." (*Id.* at 15:10). Lily reported that over the past three years, Plaintiff became more violent, meaner, and crueler. (*Id.* 16:30). She detailed an incident approximately two weeks earlier where Plaintiff slammed her into a wall, tried to strangle her, and said he wanted to kill her. (*Id.* at 18:00). After being asked what happened that morning, Lily began to detail events involving the recording, how she took Plaintiff's phone, and her earlier call to 911. When asked when Plaintiff last hit her, Lily indicated it was that morning after the deputies left. (*Id.* at 23:45). She said she went up to Plaintiff's truck to ask him what to do with their animals and Plaintiff pushed her down to the ground while the deputies were at the bottom of the driveway. When asked why she did not report the incident before the deputies left the property or earlier when she had called and spoken to Sergeant Olmos, Lily said she was just so used to Plaintiff's behavior, the officers were already at the end of the driveway, and it had been drilled into her that cops were the enemy. (*Id.*

10

1   at 42:45).

2   During the conversation, Lily indicated Plaintiff had her buy a gun that he then gave to
3   Lis. (*Id.* at 22:10). In response to questioning, Lily informed the deputies there were
4   approximately 13 firearms unsecured throughout the home. When asked if she would show the
5   firearms to the deputies, Lily said no because if Plaintiff "even knows this is going on, he will kill
6   me." (*Id.* at 24:55). Lily reported Plaintiff had at least two firearms in his vehicle. (*Id.* at 40:35).
7   Lily said Plaintiff was ready to "die by cops" and "hates cops." Lily continued to refuse to show
8   the deputies the weapons out of fear Plaintiff would kill her, stating, "if he knew you were here
9   and that you knew about the guns, that's it, it's over for me." (*Id.* at 32:55).

10   Sergeant Olmos explained to Lily that they would do reports on the previous altercation
11   and the incident that morning, and Sandoval would contact a judge to try and obtain an EPO. (*Id.*
12   at 39:35). Sandoval texted Lily a link so that she would be able to attach the various pictures as
13   evidence and Lily realized she had misplaced her phone. (*Id.* at 44:50). While Lily searched the
14   house for her phone, the deputies discussed contacting a judge[4] regarding the EPO. Sergeant
15   Olmos began to assist Lily in her search while Sandoval called the phone. Eventually, Lily asked
16   Sandoval to walk with her through the house while she looked for the phone, and while he did so
17   she showed him two unsecured firearms sitting on a desk. (*Id.* at 57:45).

18   Sandoval then exited the home to call the judge regarding the EPO. (*Id.* at 58:35). After a
19   brief conversation with Vicki where she showed him pictures of more firearms and indicated
20   Plaintiff had pushed Lily down that morning, Sandoval called the judge. (*Id.* at 1:01:10). He
21   detailed Lily's reports that Plaintiff threatened to hurt her that morning while she was locked in
22   her room, pushed her to the ground from his vehicle, and pushed her down and held her against
23   the wall approximately two weeks earlier. (*Id.* at 1:04:26). Additionally, Sandoval informed the
24   judge there were firearms in the house and the deputies were currently investigating their legality.
25   (*Id.* at 1:05:47). The judge granted the EPO with a move out order. (*Id.* at 1:06:30).

26   After the call ended and while Sandoval was still completing paperwork for the EPO,

27

---

28   [4] Judge Hugo Loza was the on-call judge at the time. (Doc. No. 26 at 11, ¶ 31).

1  Plaintiff returned to the property. (*Id.* at 1:16:15). Sandoval asked him to park his truck, and
2  once Plaintiff exited the vehicle, Sandoval checked him for weapons, handcuffed him, and
3  explained that he was being detained. Sandoval placed Plaintiff in the back of his cruiser and
4  explained that Plaintiff was a suspect in a domestic violence report and that an EPO had been
5  granted by a judge.

6  Subsequently, Sandoval informed Lily that Plaintiff was under arrest for domestic
7  violence. (*Id.* at 1:31:05). Approximately an hour after Plaintiff was initially detained, Sandoval
8  informed Plaintiff he was under arrest and Plaintiff was transferred to another vehicle for
9  transport to the jail. (*Id.* at 2:17:10; Doc. 31-1 at 24). After Plaintiff's arrest, Sergeant Olmos
10 informed Lily the deputies were seizing the house and the deputies searched Plaintiff's property.
11 (*See, e.g.*, Pl.'s Ex. C at 2:15).

12 **V.     DISCUSSION**

13 As discussed above, the Complaint advances two claims: (1) false arrest and
14 imprisonment against "all Defendants" and (2) an equal protection claim(s). (Doc. No. 1 at 5-6).
15 The second cause of action does not indicate whether it is brought against Sandoval, the County,
16 or both. The Court addresses each claim with respect to Sandoval first and then proceeds to
17 address claims against the County.

18 **A. Claim One – False Arrest in Violation of the Fourth Amendment**

19 **1. Legal Standards**

20 "The Fourth Amendment provides that the right of the people to be secure in their
21 persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be
22 violated. As that text makes clear, the ultimate touchstone of the Fourth Amendment is
23 reasonableness." *Lange v. California*, 594 U.S. 295, 301 (2021). While this standard "generally
24 requires the obtaining of a judicial warrant," the warrant requirement is subject to certain
25 exceptions." *Id.* "In order for an officer to effect a warrantless arrest, the officer needs probable
26 cause as defined by federal Fourth Amendment jurisprudence to make a warrantless arrest."
27 *United States v. Brobst*, 558 F.3d 982, 997 (9th Cir. 2009). Thus, "in the context of a § 1983
28 action, a Fourth Amendment violation occurs when a person is arrested without probable cause or

other justification." *Johnson v. Barr*, 79 F.4th 996, 1005 (9th Cir. 2023) (citation modified). Conversely, probable cause to arrest is a complete defense to a police officer's liability for an action under § 1983 arising out of the arrest. *Owen v. City of Independence,* 445 U.S. 622, 637, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990). The standard for probable cause "is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

"Probable cause to arrest exists when there is a fair probability or substantial chance of criminal activity by the arrestee based on the totality of the circumstances known to the officers at the time of arrest." *Miller v. City of Scottsdale*, 88 F.4th 800, 804 (9th Cir. 2023) (citation modified) (quoting *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022)). "This is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). And it is well-established that "[i]f the facts support probable cause … for one offense," an arrest may be lawful "even if the officer invoked, as the basis for the arrest, a different offense" which lacks probable cause. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016); *see also Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) ("[P]robable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect of any criminal offense, regardless of their stated reason for the arrest."). This is because, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593, 160 L. Ed. 2d 537 (2004) (citing *Whren v. United States,* 517 U.S. 806, 812–813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (reviewing cases)).

Where a plaintiff alleges a § 1983 claim, a government official is entitled to qualified immunity unless (1) the official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). To demonstrate that a right was "clearly

13

established" requires a showing that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. *Wesby*, 583 U.S. at 63; *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018). This standard is "demanding" and protects "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 583 U.S. at 63 (citing *Molly v. Briggs*, 475 U.S. 335, 341 (1986)). The plaintiff bears the burden of establishing the right alleged was clearly established. *Moran v. Washington*, 47 F.3d 839, 844 (9th Cir. 1998). The Ninth Circuit has summarized the two-step qualified immunity inquiry with respect to unlawful arrest claims as asking "(1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Johnson*, 79 F.4th at 1005.

While the existence of probable cause is generally a question for the jury, "summary judgment is appropriate when there is no genuine issue of fact and if no reasonable jury could find an absence of probable cause under the facts." *Johnson*, 79 F.4th at 1003 (quotation marks omitted). "However, when evaluating qualified immunity, … the threshold determination of whether the facts alleged could support a reasonable belief in the existence of probable cause is a question of law to be determined by the court." *Id.* (citation modified). Courts look to state law to determine whether an officer is authorized to make an arrest. *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

### 2. Analysis

As an initial matter, while Plaintiff's briefing appears to challenge the legality of the search of the property, the Complaint does not assert an illegal search claim but rather only asserts a false arrest claim. (*See* Doc. No. 1 at 5-6). Accordingly, any challenge to the search is not properly before the Court and the circumstances surrounding the search, which occurred *after* Plaintiff's arrest, do not bear on the legality of his arrest.

Similarly, Plaintiff appears to conflate consent to search his home with the concept of whether *probable cause* existed for the arrest, expending approximately five pages of briefing

addressing whether the arrest occurred in the curtilage of the home. To the extent Plaintiff is attempting to challenge the deputies' presence at the home, the undisputed evidence shows that the deputies were present on the property in response to a 911 call from Lily, a resident of the home. "Although the Fourth Amendment generally prohibits law enforcement from entering a home without a warrant, the government may overcome the presumption of unconstitutionality by showing that law enforcement received consent to enter the home." *United States v. Lowe*, 676 F. App'x 728, 732 (9th Cir. 2017) (citing *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016 (9th Cir. 2008)). "Moreover, once law enforcement receives consent to enter the home, the officers may arrest a suspect … without having to first acquire a warrant, so long as the arrest is supported by probable cause." *Id.* (citing *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010)). Thus, because the deputies were present at the property with Lily's consent, it is irrelevant whether the arrest occurred in the curtilage of the home so long as the arrest was supported by probable cause.

Considering the totality of the circumstances known to Sandoval, probable cause existed to arrest Plaintiff for domestic violence. *Supra*, in evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest. *See also*, *United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993). Specifically, as it relates to reports of domestic abuse, California law authorizes an officer to make a warrantless arrest for misdemeanor domestic violence:

> [I]f a suspect commits an assault or battery upon a current or former spouse . . . a peace officer may arrest the suspect without a warrant where both of the following circumstances apply:
>
> (1) The peace officer has probable cause to believe that the person to be arrested has committed the assault or battery, whether or not it has in fact been committed.
>
> (2) The peace officer makes the arrest as soon as probable cause arises to believe that the person to be arrested has committed the assault or battery, whether or not it has in fact been committed.

California Penal Code § 836(d). Additionally, California law defines battery as "any willful and unlawful use of force or violence upon the person of another" and makes battery against a spouse a criminal offense. Cal. Penal Code §§ 242, 243(e)(1).

Plaintiff disputes Lily's version of events and contends that Deputy Sandoval should deemed her claims uncredible. The Ninth Circuit precent holds that a factual dispute does not necessarily preclude a finding of probable cause in the case of suspected domestic violence. *See Peng v. Mei Chin Penghu*, 335 F.3d 970, 979 (9th Cir. 2003) ("[T]he presence of a factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if: 1) the victim's statements are sufficiently definite to establish that a crime has been committed; and 2) the victim's complaint is corroborated by either the surrounding circumstances or other witnesses."). Here, Deputy Sandoval formed probable cause only after a reasonable investigation. Sandoval heard allegations from Lily that Plaintiff pushed her down that morning after officers walked to the bottom of the driveway; Plaintiff beat and strangled her a few weeks earlier; Plaintiff threatened to kill her; and Plaintiff had multiple unsecured firearms throughout the house. Sandoval also encountered and spoke with three separate individuals—Vicki, the neighbor, and the male friend—who expressed concern that Plaintiff had harmed Lily, corroborating Lily's claims. Vicki also reported the same instances of abuse as Lily did and reported having pictures of Lily's bruises, which would support Lily's allegations. Further, based on this same information and consistent with Sandoval's belief that Lily was the victim of domestic abuse, Sandoval relayed the information he had collected to the judge, and the judge, based on his independent review of information, granted Lily an EPO shortly before Plaintiff's arrest. Regardless of whether Sandoval observed the photographs before the arrest, the totality of the circumstances supports a finding that Sandoval had reasonably reliable facts to reasonably believe that Plaintiff committed a violation of Penal Code § 243(e)(1). *Beck v. Ohio*, 379 U.S 89, 91 (1964) (the standard asks whether the officer "had reasonably trustworthy information ... to warrant a prudent man in believing that the petitioner had committed or was committing an offense."). And, Plaintiff was arrested shortly after Sandoval had formed probable cause. Accordingly, no constitutional violation occurred.

Even if a reasonable jury could conclude Sandoval lacked probable cause, the Court concludes qualified immunity applies to shield Sandoval from liability. "An officer would not be on notice that his or her action was unreasonable unless all reasonable officers would agree that

16

there was no probable cause in this instance." *Johnson*, 79 F.4th at 1005 (finding defendants entitled to qualified immunity "although a reasonable jury could find that [they] lacked probable cause to arrest" plaintiff). Thus, an officer is entitled to qualified immunity where it is "reasonably arguable" that there was probable cause to arrest. *Id.*

Plaintiff appears to suggest that Sandoval should have done more—reviewed the photographs, questioned Lily's motives—but clearly established law requires only a reasonable investigation, not an exhaustive one. *See Johns v. City of Eugene*, 771 F. App'x 739, 741 (9th Cir. 2019) (reversing district court's denial of qualified immunity on basis that district court found officers could have done more). Consequently, even if Deputy Sandoval was mistaken to conclude that probable cause was present, his conduct falls fall short of incompetence. *See Rodis v. City and County of San Francisco*, 558 F.3d 964, 970-971 (9th Cir. 2009) (noting "[t]he Supreme Court has 'recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present.' . . . In such cases those official should not be held personally liable."). Thus, considering the totality of the circumstances known to Sandoval at the time based on the evidence before the Court, it is not clear that every reasonable officer would be on notice that Sandoval's actions were unreasonable to be unconstitutional. Accordingly, in the alternative, the Court finds Deputy Sandoval is entitled to qualified immunity.

### B. Equal Protection

The Equal Protection clause provides that "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Clause "requires the State to treat all similarly situated people equally." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013). There are two different ways in which a plaintiff may state an equal protection claim. A plaintiff's first option is to allege "facts plausibly showing that the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class." *Id.* (quoting *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005)). The second way a plaintiff may state a claim is "as a 'class of one' by alleging that [the] plaintiff has 'been intentionally treated differently from others similarly

situated and that there is no rational basis for the treatment." *Koboyashi v. McMulling*, 2022 WL 3137958, at *23 (C.D. Cal. May 31, 2022) (quoting *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). When a plaintiff fails to identify a similarly situated individual, he fails to plead a cognizable class-of-one claim. *Teixeira v. Cnty. of Alameda*, 822 F.3d 1047, 1053 (9th Cir. 2016), *on reh'g en banc.*, 873 F.3d 670 (9th Cir. 2017).

Here, contrary to Plaintiff's argument, Defendants have satisfied their initial summary judgment burden. When the moving party does not carry the ultimate burden of persuasion at trial, it may carry its initial burden by (1) producing evidence negating an essential element of the nonmoving party's case, *or* (2) showing that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Here, Defendants point first to Plaintiff's failure to identify a similarly situated individual, an essential element of his claim. (*See* Doc. No. 24-1 at 17). Anticipating that Plaintiff would identify Lily as a comparator, Defendants argue there is not enough evidence to establish that Plaintiff was treated differently than Lily—again, an essential element of his equal protection claim—because his arrests were supported by probable cause. (*Id.* at 17-20).

Because Defendants have satisfied their initial burden, the burden shifts to Plaintiff to "produce evidence to support [his] claim." *Nissan Fire & Marine Ins.*, 210 F.3d at 1103. Plaintiff wholly fails to present argument or cite to any evidence establishing he was treated differently than any similarly situated individual. This failure alone is sufficient to warrant summary judgment on Plaintiff's equal protection claim. *Id.* ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.").

Accordingly, summary judgment on the equal protection claim is warranted.

**C. The County's Liability**

A local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell.*, 436 U.S. at 694. "When an individual sues a municipality for violation of a constitutional right, the municipality is liable only if the individual can establish

that the municipality 'had a deliberate policy, custom, or practice that was the "moving force" behind the constitutional violation he suffered.'" *Lawrence v. City & Cnty. of San Francisco*, 258 F. Supp. 3d 977, 993 (N.D. Cal. 2017) (citing *Monell*, 436 U.S. at 694-95). However, to state a *Monell* claim, Plaintiff must adequately demonstrate an underlying constitutional violation by a county employee. *See Scott v. Heinrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("municipal defendants cannot be held liable because no constitutional violation occurred"); *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) ("*Monell* claims … require a plaintiff to show an underlying constitutional violation.").

Here, the Court has already concluded Plaintiff failed to establish a constitutional violation. This failure necessarily means Plaintiff's claims against the County also fail. *See Lockett*, 977 F.3d at 741. Accordingly, summary judgment in favor of the County is warranted.

Accordingly, it is **ORDERED**:

1. Defendants' Request for Judicial Notice (Doc. No. 24-6) is **DENIED.**
2. Defendants' Motion for Summary Judgment (Doc. No. 24) is **GRANTED**.
3. The Clerk of Court is directed to vacate all deadlines, enter judgment in favor of Defendants, and CLOSE this case.

Dated:   September 18, 2025

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE